# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DARRELL K. HAZE,

      **Plaintiff,**

      v.                                    **Case No. 13-CV-1344**

MARK KUBICEK,

      **Defendant.**

---

### DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Darrell K. Haze ("Haze") brings this action pursuant to 42 U.S.C. § 1983 against Milwaukee police officer Mark Kubicek ("Kubicek"). The case stems from an interaction between Haze and the Milwaukee Police, particularly Officer Kubicek, outside the Bradley Center on March 22, 2012. Haze alleges that his Fourth Amendment, Fifth Amendment, and Due Process rights were violated because he was unreasonably detained and illegally arrested, because Kubicek used excessive force, and because he was maliciously prosecuted.

Presently before me is Kubicek's motion for summary judgment and Haze's motion for partial summary judgment. Kubicek argues that summary judgment must be granted because the plaintiff cannot show violations of his constitutional rights and because Officer Kubicek is entitled to qualified immunity. Haze seeks partial summary judgment finding that issue preclusion prevents the defendant from arguing that the arrest was lawful as well as a finding that the arrest was indeed unlawful. The motions have been fully briefed and are ready for decision. For the reasons that follow, Kubicek's motion for summary judgment is granted in part and denied in part. Haze's motion for summary judgment is denied.

## COMPLIANCE WITH FEDERAL AND LOCAL RULES

Before turning to the substance of the parties' motions, I will address Kubicek's argument that I should deny Haze's motion for summary judgment for failing to comply with the federal and local rules. Particularly, Kubicek argues that Haze's proposed findings of fact do not contain references to appropriate supporting material and that his brief, though it contains "some passing references to documents," does not reference particular parts of those documents, which violates Fed. R. Civ. P. 56(c)(1) as well as Civil L.R. 56(b)(1)(C)(I). Both the federal rules and the local rules require a party to submit a statement of proposed material facts that are supported by specific references to materials supporting the proposed fact (such as affidavits, declaration, or portions of the record).

Upon reviewing both Haze's original proposed findings of fact (Docket # 43) as well as his additional proposed findings of fact (Docket # 52), I do not find that Haze's motion should be denied for failure to comply with the applicable federal and local rules. His original proposed findings of fact cite to both the municipal court transcript as well as an expert report. (Docket # 43.) Haze's additional proposed findings of fact cite to his own declaration as well as the declaration of Lorene Lee. (Docket # 52.) Therefore, Haze's submissions sufficiently comply with the federal and local rules.

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does

-2-

not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## FACTS

Officer Kubicek is a police officer with the City of Milwaukee Police Department ("MPD"), and he was so employed at all times pertinent to this case. (Defendant's Proposed Findings of Fact ("DPFOF") at ¶ 1.) Officer Kubicek, along with Officers Pernell Reynolds and Paul Helminiak, was on bicycle duty in the downtown area on March 22, 2012. (DPFOF at ¶ 2.) At approximately 6:30 p.m., Kubicek, along with Reynolds and Helminiak, were in the vicinity of the Bradley Center, located at 1001 North 4th Street in Milwaukee. (DPFOF at ¶ 3.) On that night, the Milwaukee Bucks were scheduled to play at the Bradley Center at 7:00 p.m. (DPFOF at ¶ 4.) Both the vehicular and pedestrian traffic was heavy due to the game. (DPFOF at ¶ 5.)

-3-

Milwaukee County ordinance § 105-56 concerns the selling of tickets to an event outside of a venue; particularly, it prohibits selling tickets above face value within 500 feet of the venue in the two hours preceding the event. (DPFOF ¶¶ 6, 7.) Milwaukee ordinance § 95-1 requires those engaged in direct sales on any public way or on other public premises to have a license (DPFOF at ¶ 9), though there are exceptions to that requirement, including anyone reselling tickets to entertainment or sporting events at or below face value (Pl.'s Response to DPFOF at ¶ 9). The activity of selling tickets in violation of municipal ordinance and state laws is commonly referred to as "scalping." (DPFOF at ¶ 8.) According to the defendant, scalping occurs regularly at various venues throughout the City of Milwaukee (including the Bradley Center), and it has been the object of investigations as well efforts to curtail the practice. (DPFOF at ¶ 10.) He also states that curtailing and investigating scalping were among the duties of the bicycle patrol in the area. (*Id.*) Earlier in the week, there had been complaints of fraudulent tickets being sold in the area, and part of the officers' patrol duties was to be on the lookout for sales of fraudulent tickets. (DPFOF at ¶ 11.)

Officer Kubicek observed Haze on the southwest corner of North 4th Street and West Juneau Avenue. (DPFOF at ¶ 12.) Kubicek believed that Haze was within 500 feet of the Bradley Center for purposes of Ordinance § 105-56. (DPFOF at ¶ 13.) Haze was holding a sign that read, "We need tickets." (DPFOF at ¶ 14.) There was another person standing near Haze who was holding a sign that read, "Now selling tickets." (DPFOF at ¶ 15.) Kubicek suspected that either or both of these individuals may have been involved in illegal activity regarding the sale of tickets. (DPFOF at ¶ 16.) Kubicek was aware that individuals hold signs like the one held by Haze and the other man in an attempt to buy tickets and sell them at a price higher than their face value (that is, to engage in scalping). (DPFOF at ¶ 17.) Haze points out that it is permissible for people to resell tickets at or below face value without a permit. (Pl.'s Response to DPFOF at ¶ 17.)

-4-

Following his observations, Kubicek and his partners decided to go investigate. (DPFOF at ¶ 18.) At a municipal court trial involving this incident, Kubicek testified that there had been complaints of people buying fraudulent tickets. (Pl.'s Response to DPFOF at ¶ 18; Municipal Court Tr., Docket # 42-1 at 19-21.) The parties largely disagree about the general nature of and the specific details regarding the encounter between Haze and the Milwaukee police officers. According to Kubicek, he and his partners approached on their bicycles and told both men that they would like to speak with them. (DPFOF at ¶ 19.) While the parties agree that the person holding the "selling" sign was cooperative in both his posture and response (DPFOF at ¶ 20), Kubicek and Haze differ on what happened next. Kubicek states that Haze initially stopped, but then told Kubicek he did not have to "put up with being profiled by the police," and turned and walked quickly away. (DPFOF at ¶ 21.) Haze disputes that he said anything about profiling to the officers or that he walked away. (Pl.'s Response to DPFOF at ¶ 21.)

According to Kubicek, he shouted after Haze to stop, but Haze did not stop. (DPFOF at ¶ 22.) Kubicek then pursued Haze on his bicycle and again told him to stop, but Haze again did not comply. (DPFOF at ¶ 23.) Once Kubicek caught up to Haze, he cut in front of Haze on his bicycle and told the plaintiff that he was not free to go. (DPFOF at ¶ 24.) Kubicek dismounted his bicycle and placed his hand on Haze's right arm and used a pressure hold in order to get Haze to comply with his command to stop. (DPFOF at ¶ 25.) Haze then pulled his arm away, resisting Kubicek's hold on his arm. (DPFOF at 26.) Officers Helminiak and Kubicek then placed Haze in handcuffs in order to maintain control of Haze and the scene while they investigated a possible illegal ticket selling scheme. (DPFOF at ¶ 27.) Haze contends that there is no evidence that the officers conducted such an investigation. (Pl.'s Response to DPFOF at ¶ 27.) Around the time Kubicek and Helminiak were handcuffing Haze, Kubicek noted that Haze's breath smelled strongly of intoxicants and that Haze

-5-

appeared to be intoxicated. (DPFOF at ¶ 28.) In addition to his breath smelling of intoxicants, Kubicek noted that Haze's speech was slurred, his eyes were bloodshot, and he had a belligerent attitude. (DPFOF at ¶ 28.) Haze denies that he had been drinking alcohol, that his breath smelled of intoxicants, that his speech was slurred, and that he was belligerent or had an uncooperative attitude. (Pl.'s Additional Proposed Findings of Fact ("PAPFOF") at ¶¶ 16-20.) As they were handcuffing Haze, he began to yell to Officer Reynolds, an African American, "Hey black boy, hey black boy, you need to help out with this profiling bullshit." (DPFOF at ¶ 29.) Haze denied making any such statement. (Pl.'s Response to DPFOF at ¶ 29.) Kubicek noted that Haze's yelling and actions caused passerby to stop and look at Haze and the scene. (DPFOF at ¶ 30.)

Kubicek was trying to identify Haze, but Haze was uncooperative, was yelling, and "being disorderly." (DPFOF at ¶ 31.) Kubicek placed Haze up against a low wall so that he could lean against it and not lose his balance. (DPFOF at ¶ 32.) At that point, Kubicek saw Haze wink at Officer Reynolds and then throw himself on the ground. (DPFOF at ¶ 33.) Haze began to yell that Kubicek had injured him. (DPFOF at ¶ 33.) Haze denies he winked at Reynolds or threw himself on the ground. (PAPFOF at ¶¶ 24-25.) He rolled on the ground and yelled, "I'm going to collect my thousands off you fools," or something to that effect. (DPFOF at ¶ 34.) Haze denies making such a statement. (PAPFOF at ¶ 26.) The parties agree that once Haze was on the ground, Kubicek and one of his partners helped Haze off the ground and arranged for an ambulance after Haze reported he was injured. (DPFOF at ¶ 35.) They also agree that Lorene Lee ("Lee") then arrived on the scene and explained she was a friend of Haze's. (DPFOF at ¶ 36.) Based on Lee's comments, Kubicek thought he might discover evidence regarding an earlier instance of scalping, possibly a battery, or even domestic violence. (DPFOF at ¶ 38.) Kubicek therefore continued to speak with Lee. (DPFOF at ¶ 38.) Kubicek was also trying to get information from Haze, but Haze was still uncooperative.

-6-

(DPFOF at ¶ 39.) Haze also made comments about the officers wanting to drag him away so that they could shoot him. (DPFOF at ¶ 40.)

Haze's presentation of the encounter is as follows. Haze states that he was approached by Kubicek and asked for his ID. (PAPFOF at ¶ 5.) Haze told Kubicek that his ID was in his fanny pack, which was in front of him. (PAPFOF at ¶ 6.) As Haze reached into his fanny pack, Kubicek grabbed his right arm, causing pain to his arm; applied a pressure hold causing pain to his arm and neck; and slammed him into the ground, causing injury to his neck and shoulder. (PAPFOF at ¶ 7.) The parties agree that Haze was handcuffed. (PAPFOF at ¶ 8.) Haze says that Kubicek then began to search Haze's pant pockets and fanny pack (PAPFOF at ¶ 9) and patted around his body (PAPFOF at ¶ 10). Kubicek then picked up Haze and placed him against a wall (the parties agree about this). (PAPFOF at ¶ 11.) Due to his pain and injuries, Haze lost his balance and fell to the ground. (PAPFOF at ¶ 12.) Haze asked Officer Reynolds for an ambulance (PAPFOF at ¶ 13) and also asked the officers to get their supervisor (PAPFOF at ¶ 14). He was "in extreme pain, dizzy, injured and handcuffed." (PAPFOF at ¶ 28.) Haze denies that he resisted the officers (PAPFOF at ¶ 27) and that he walked away (PAPFOF at ¶ 30). He also denies hiding the sign he was holding. (PAPFOF at ¶ 29.) According to Haze, Kubicek did not ask him any questions about selling tickets. (PAPFOF at ¶ 32.)

The parties agree that Kubicek did not threaten to shoot or harm Haze in any way, nor did Kubicek hear anyone else threaten Haze. (DPFOF at ¶ 41.) They also agree that Kubicek and his partners decided to call their supervisor to the scene to handle Haze's accusation that the officers threatened to shoot him and that Haze agreed that he would like to speak to a supervisor. (DPFOF at ¶ 42.) Approximately 15 minutes after the encounter, around 6:45 p.m., an ambulance arrived and plaintiff began to receive treatment. (DPFOF at ¶ 44.) His handcuffs were removed in order to allow

-7-

Haze to receive treatment. (DPFOF at ¶ 45.) Haze provided his identifying information to the ambulance personnel, which the officers used to run a warrant check, which came back negative. (DPFOF at ¶ 47.) After the ambulance arrived, Sergeant Walter McCullough ("Sergeant McCullough") responded to the supervisor request. (DPFOF at ¶ 49.) Haze told Sergeant McCullough that an officer threatened to shoot him, but Haze was unable to identify which officer made the threat when Sergeant McCullough presented each of the officers (including Kubicek) to Haze individually. (DPFOF at ¶ 50.) Haze was then transported to a hospital a few blocks away. (DPFOF at ¶ 51.)

At this point, Kubicek states that given the nature of the events that had unfolded, his investigation was no longer a priority and not worth maintaining. (DPFOF at ¶ 46.) In debriefing, it was determined that Kubicek would issue Haze a citation for disorderly conduct. (DPFOF at ¶ 52.) Kubicek and his partners then went to the hospital to serve Haze with the citation. (DPFOF at ¶ 53.) They went to the waiting room, but Haze was not there. (DPFOF at ¶ 55.) As they were leaving, they observed Haze outside the hospital. (DPFOF at ¶ 56.) Kubicek and his partners approached Haze and served him with the citation. (DPFOF at ¶ 57.) According to Kubicek, he explained the citation. (DPFOF at ¶ 57.) Haze, however, denies that Kubicek explained the citation to him. (Pl.'s Response to DPFOF at ¶ 57; PAPFOF at ¶ 31.) After serving Haze with the citation, Kubicek and his partners returned to patrol around the Bradley Center. (DPFOF at ¶ 58.)

Haze ultimately went to trial on the citation. (Plaintiff's Proposed Findings of Fact ("PPFOF") at ¶¶ 3-5.) The citation was dismissed, and the judge stated, in part, "There's no testimony that you technically committed a crime." (Docket # 42-1 at 21.)

-8-

## ISSUE PRECLUSION

I will begin by addressing Haze's argument that issue preclusion bars Kubicek from arguing that Haze's arrest was lawful. Kubicek counters that issue preclusion should not and does not apply. For the reasons explained below, I agree; the application of issue preclusion is unwarranted in this case.

The doctrine of issue preclusion, or collateral estoppel, allows a party to seek to foreclose the opposing party from litigating an issue that it has previously litigated and lost. *Parkland Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 4 (1979); *A.J. Canfield Co v. Vess Beverages, Inc.*, 859 F.2d 36, 36 (7th Cir. 1988). "A state court judgment is entitled to the same preclusive effect in federal court as that judgment would have in state court." *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 772 (7th Cir. 2013) (citing *Allen v. McCurry*, 449 U.S. 90, 96 (1980); 28 U.S.C. § 1738). A federal court, therefore, looks to the law of the state in which the underlying judgment was issued. *Gutnayer v. Cendant Corp.*, 116 Fed. Appx. 758, 760 (7th Cir. 2004) (citing 28 U.S.C. § 1728; *Marresse v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985); *Am. Nat. Bank & Trust Co. of Chicago v. Regional Transp. Authority*, 125 F.3d 420, 430 (7th Cir. 1997)). In Wisconsin, determining whether issue preclusion applies requires that two criteria be satisfied. *First Weber Group*, 738 F.3d at 773 (citing *Mrozek v. Intra Fin. Corp.*, 2005 WI 73, ¶ 17, 281 Wis. 2d 448, 463-64, 699 N.W.2d 54, 61). The first criteria "requires that 'the question of fact or law that is sought to be precluded actually must have been litigated in a previous action and [have been] necessary to the judgment.'" *Id.* The second criteria is more equitable in nature, and it "requires the court to 'determine whether it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand." *Id.*

-9-

In this case, Haze argues that the Milwaukee Municipal Court determined that he was unlawfully arrested and entered judgment in his favor following a trial on the citation for disorderly conduct. At trial, both Lee and Kubicek testified. Lee testified that she was across the street when the officers were handcuffing Haze, and she could not hear anything Haze said. (Docket # 42-1 at 9-10.) Lee further testified that when she got to the scene, Haze was not shouting or yelling, but he was crying. (*Id.* at 10.) Kubicek testified consistently with the facts he proposed in support of his motion for summary judgment. He testified that Haze initially stopped when Kubicek told him to do so but that he quickly "stormed off." (*Id.* at 16.) Kubicek testified he bicycled in a manner to cut off Haze's travel and told Haze he was not free to go anywhere. (*Id.*) When Haze continued to walk away, Kubicek took control of his right arm. (*Id.*) Kubicek testified it was then that Haze shouted loudly, "hey black boy, hey black boy, you need to help me out with this profiling bullshit." (*Id.* at 17.) He further testified that he then "stabilized" Haze by leaning him against a barricade—he was worried Haze might fall, partly because he believed Haze was intoxicated. (*Id.*) Then, Kubicek testified, Haze winked at Officer Reynolds and threw himself on the ground. (*Id.*)

The court then asked Kubicek if the sign Haze was holding was the reason he made the initial contact with Haze. (*Id.* at 19.) Kubicek responded that "[i]t wasn't the sign in and of itself, it was the fact that [Haze] tried to hide the sign and march in a different direction once we arrived." (*Id.*) Kubicek went on, explaining, "There—there were some general complaints that week of—of citizens complaining that they had made transactions for game tickets that ended up being tickets that weren't valid . . . ." (*Id.* at 19-20.) He stated that they "had that in the back of [their] mind, as [they] were doing this patrolling [inaudible]." (*Id.* at 20.) The court then asked whether Haze was too close to the Bradley Center to scalp tickets, and Kubicek replied:

-10-

> I believe so, but my—my—put it this way, my—my goal is just to make sure that that's all that was going on, was him trying to make money, that there wasn't more to it, because was—he was right next to another scalper that was completely comfortable with police presence and I didn't know why Mr. Haze felt the need to appear sneaking in a manner.

(*Id.* at 20-21.)

The court then asked to see everyone in chambers. Following a conversation off the record, the judge stated:

> All right. Having an opportunity to talk to the parties in—in chambers and basically questioning by the City, I think that we have a situation where we don't have—the law recognizes certain citizen/police encounters, but during those citizen/police encounter[s], the individual's always free to leave unless they've committed a crime. Of course, your behavior might not have been appropriate at the time, but not—did not arise to the level of criminal activity. So based on that, I'm going to dismiss the citation against you, okay?

(*Id.* at 21.)

The first question before me is whether the issue that Haze seeks to preclude—whether Kubicek arrested Haze and whether, if so, the arrest was lawful—was actually litigated and necessary to the judgment. "In order to know what was 'actually litigated,' [a court] must take a closer look at what the state court decided." *First Weber Group*, 738 F.3d at 773. The issue at the municipal court trial was whether Haze had violated Milwaukee County's disorderly conduct ordinance. The court heard testimony from two witnesses and then held a conversation off the record. It then decided that the citation against Haze should be dismissed. Haze argues that the court's comments about citizen/police encounters and being free to leave means that the municipal court determined that (1) Haze had been arrested and (2) that the arrest was unlawful. The municipal court judge also stated that Haze's behavior, though perhaps not appropriate, did not rise to the level of criminal activity. However, although the facts are the same here as they were at the municipal court trial, the issue of

the lawfulness of the arrest (or whether there was an arrest) was not specifically at issue in the municipal trial. Moreover, though the municipal judge hinted at his view of the encounter between Haze and the officers, the judge made no explicit finding regarding the lawfulness of the arrest. His reasoning or basis for dismissing the citation were likely discussed more thoroughly during the off the record conversation in chambers. Therefore, on this record, it is not readily apparent that the issue of the nature of the encounter between Haze and the officers was actually litigated, nor that it was necessary to the judgment. Under the first factor, issue preclusion would be inappropriate.

Examining the second criteria—the equitable consideration—reinforces the finding that issue preclusion is not appropriate in this case. The Wisconsin Supreme Court has stated that there are several factors that are appropriate to consider in determining whether applying issue preclusion would be fair:

> (1) whether the party against whom preclusion is sought could have obtained review of the judgment; (2) whether the question is one of law that involves two distinct claims or intervening contextual shifts in the law; (3) whether there are apt to be significant differences in the quality of extensiveness of the two proceedings such that relitigation of the issue is warranted; (4) whether the burden of persuasion has shifted such that the party seeking preclusion had a lower burden of persuasion in the first trial than in the second; and (5) whether matters of public policy or individual circumstances would render the application of issue preclusion fundamentally unfair, including whether the party against whom preclusion is sought had an inadequate opportunity or incentive to obtain a full and fair adjudication of the issue in the initial litigation.

*Mrozek*, 2005 WI 73 at ¶ 17, 281 Wis. 2d at 463-64, 699 N.W.2d at 61-62 (citing *Michelle T. by Sumpter v. Crozier*, 173 Wis. 2d 681, 688-89, 495 N.W.2d 327, 330-31 (Wis. 1993) (citing Restatement (Second) of Judgments § 28 (1980))). The third and fifth factors are particularly relevant here. The initial proceeding was a municipal court trial on an ordinance citation. Here, the plaintiff seeks redress for alleged wrongs under § 1983 and the Fourth, Fifth, and Fourteenth Amendments. The stakes in the present lawsuit are much higher for all parties involved. There are "apt to be differences

-12-

in the quality and extensiveness of the two proceedings." The fifth factor, which concerns public policy, also weighs in favor of not applying issue preclusion. While Kubicek may have had an interest in the outcome of the municipal court trial, he was not the one prosecuting the citation. He therefore lacked the opportunity and the incentive to fully adjudicate the issue of the nature of the encounter between himself and Haze. He is now named a defendant in a civil rights lawsuit, and as noted above, the stakes are significantly higher. In sum, both criteria to be considered mandate a finding that the application of issue preclusion would be inappropriate in this case.

## MOTIONS FOR SUMMARY JUDGMENT

I will now turn to the parties' motions for summary judgment. Haze moves for summary judgment on his claim that the encounter between himself and Kubicek resulted in an unlawful arrest. Kubicek moves for summary judgment on this claim as well, arguing that the encounter resulted in a *Terry* stop that was properly supported by the requisite reasonable suspicion. He also moves for summary judgment on Haze's excessive force claim. Additionally, Kubicek argues that not only is he entitled to judgment on the merits of Haze's claims but also that he is entitled to qualified immunity. The determination of whether qualified immunity should shield an officer from suit inherently requires, to some extent, an evaluation of the substance (and merits) of a claim. Therefore, I will determine if summary judgment is appropriate as to each of Haze's claims in both respects.

1.      *Nature of the Encounter*

Both the plaintiff and the defendant move for summary judgment on the issue of unlawful arrest. Therefore, I must characterize the nature of the encounter between Haze and the Milwaukee police officers. Generally, there are three types of citizen-police encounters. *United States v. Felix-Felix*, 275 F.3d 627, 632 (7th Cir. 2001), *superseded by statute on other grounds*. The first is a consensual

-13-

encounter, which "involves no restraint on a subject's liberty and is characterized by non-coercive police questioning of a citizen" in a public place. *Id.* This type of encounter "is not a seizure within the meaning of the Fourth Amendment and requires no objective justification." *Id.*; *see also, e.g.*, *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *United States v. Burton*, 441 F.3d 509, 511 (7th Cir. 2006), *cert. denied*, 127 S.Ct. 1276 (2007).

The second type of encounter is an investigatory or *Terry* stop, which consists of a brief detention or seizure, during which an officer will ask the detainee a moderate number of questions to dispel or confirm an officer's reasonable suspicion that the detainee has committed or is about to commit a criminal act. *Terry v. Ohio*, 392 U.S. 1 (1968); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). In order to justify a *Terry* stop, the officer must have "'specific and articulable facts which, taken together with the rational inferences drawn from those facts, reasonably warrant the intrusion.'" *United States v. Rivers*, 121 F.3d 1043, 1045 (7th Cir. 1997) (quoting *Terry*, 392 U.S. at 21).

The third type of encounter is an arrest "for which the police are required to have probable cause to believe that a person has committed or is committing a crime." *Felix-Felix*, 275 F.3d at 633 (citing *Beck v. Ohio*, 379 U.S. 89, 96-97 (1964)).

The parties' versions of events vary greatly. Indeed, Haze and Kubicek agree on very little about what occurred between Haze and the police officers, and disputes of material fact preclude summary judgment—for either party—on the issue of the nature of the encounter.

According to Kubicek, the encounter began when he and his partners approached Haze and the other man holding a sign. At first, Haze was compliant, but he shortly told them he did not have to stand for racial profiling and began to quickly walk away. Kubicek, who had gotten off of his bike to speak with Haze and the other man, got back on his bicycle, told Haze to stop, and caught up with

-14-

Haze, cutting off his path forward. Kubicek told Haze that he was not free to leave and got off of his bicycle. Kubicek says he applied a hold on Haze's right arm, and Haze tried to pull his arm away. Kubicek also says that Haze was yelling, belligerent, and generally uncooperative, and that Haze seemed to be intoxicated—he smelled of intoxicants and his eyes were glassy and bloodshot. According to Haze, on the other hand, Kubicek asked him for his ID immediately when he approached him. Haze reached into his fanny pack to grab it, and as he did so, Kubicek grabbed his right arm, applied a hold, and then slammed him into the ground.

With such disparate accounts of what happened during the encounter, I cannot determine the degree of intrusion, or, in turn, whether it was justified. Without being able to characterize the seizure, I cannot determine whether Kubicek and other officers had adequate justification (i.e. reasonable suspicion or probable cause). In short, with the facts in dispute such as they are, I am not able to determine if Haze's constitutional rights were violated during his encounter with the Milwaukee police officers. Therefore, summary judgment is not appropriate on the merits of Haze's unlawful arrest claim.

I now turn to the question of whether Kubicek is entitled to qualified immunity. Qualified immunity is "immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). It protects government officials from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* When an officer "reasonably believes that his . . . conduct complies with the law," he is shielded from liability. *Id.* at 244.

The defense of qualified immunity is analyzed in two steps: (1) whether, under the plaintiff's version of the facts, a constitutional right was violated; and (2) whether the right was clearly

-15-

established at the time of the alleged unconstitutional conduct. *Id.* at 232 (internal citations omitted). "The plaintiff bears the burden of establishing the existence of a clearly established constitutional right." *Kernats v. O'Sullivan*, 35 F.3d 1171, 1177 (7th Cir. 1994) (internal citation omitted). In order for a right to be clearly established "a right must be specific to the relevant factual context of a cited case and not generalized with respect to the Amendment that is the basis of the claim." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004)). "'[T]he very action in question [need not have] previously been held unlawful' for a public official to have reasonable notice of the illegality of some action." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). That is, "a factual case is not necessarily required; the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional." *Dantzler v. City of Milwaukee*, No. 10-C-0675, 2012 WL 3778958, * 12 (E.D. Wis. Aug. 30, 2012) (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1023 (7th Cir. 2000)).

As already discussed, according to Haze, he was approached by Kubicek and other officers and asked for identification. He reached into his fanny pack to retrieve his ID, at which point Kubicek grabbed his right arm, applied a hold, and then shoved Haze to the ground. Haze was then handcuffed and Kubicek began to search his pockets and fanny pack and pat down his body. Kubicek then picked up Haze and leaned him against a wall. Haze, due to his pain and injuries, lost his balance and fell to the ground.

Under Haze's version of the facts, the seizure amounted to an arrest; that is, the seizure exceeded the bounds of a consensual encounter or a *Terry* stop. Assuming for the purposes of qualified immunity analysis that the officers had reasonable suspicion to approach Haze and ask him some questions, they did not have information that would justify effectuating a seizure in the manner

-16-

Haze describes it. That is, the degree of intrusion was not proportionate to the facts known to the officers at the time they, according to Haze, approached him and then pushed him to the ground and applied handcuffs. Even if the restraint was not technically an arrest, police restraint that is so intrusive that it is "tantamount" to an arrest may require probable cause. *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (citing *Dunway v. New York*, 442 U.S. 200, 212-16 (1979)). In short, under Haze's proposed facts, the seizure exceeded the bounds of *Terry*.

Because under Haze's version of the facts, which is the version I must consider here, the seizure exceeded the scope of a consensual encounter or a *Terry* stop and was, at the very least, tantamount to an arrest, the police were required to have probable cause to arrest Haze. Whether an arrest is constitutionally valid depends upon whether "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Determinations of probable cause are naturally based on probabilities, and a finding of probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003) (internal quotation and citation omitted). Officers can rely on their reasonable inferences from the facts known to them, based on their training and experience. *Id.* To determine whether an officer had probable cause to arrest an individual, the court examines the events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to" probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation and citation omitted).

-17-

Looking at the evidence in the light most favorable to Haze, even if the officers had reasonable suspicion at the time they approached Haze, they did not have the requisite probable cause. The officers knew little: there had been some reports that fraudulent tickets had been sold in the area; Haze was holding a sign that said he needed tickets (while standing near a man holding a sign that said he was selling them); and Haze seemed to be within 500 feet of the Bradley Center. A reasonable officer, based on that information, would not be led to believe there was probable cause that Haze was committing or about to commit a crime. While the behavior may have raised suspicion (and justified an investigatory stop), it did not create probable cause to believe Haze was breaking the law. Therefore, under Haze's set of facts in which he was arrested (actually or effectively) immediately upon making contact with the officers, he has alleged a constitutional violation.

I now must turn to the second inquiry: was the right clearly established at the time of the alleged unconstitutional conduct? The alleged violation was that Haze was arrested without probable cause in violation of the Fourth Amendment. As explained in *Mahoney v. Kesery*, whether Kubicek's "immunity defense can be sustained turns on whether 'a reasonably well-trained officer in his position would have known' that the facts did not establish probable cause for arrest." 770 F. Supp. 472, 476 (E.D. Wis. 1991) (citing *Jones v. City of Chicago*, 856 F.2d 985, 993-94 (7th Cir. 1988)). Construing the facts in Haze's favor, as I must, Kubicek should have known that his observations of Haze did not amount to probable cause to arrest Haze for illegally selling tickets or selling fraudulent tickets. It would not even amount to "arguable probable cause." *See Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 714-15 (7th Cir. 2013) ("The probable cause standard inherently allows room for reasonable mistakes, but qualified immunity affords an added layer of protection by

shielding officers from 'suit for damages if a "reasonable officer could have believed [the arrest] to be lawful . . . ."'" (internal citations and quotations omitted)). Therefore, Kubicek is not entitled to qualified immunity, and Haze's claim survives summary judgment.

2. *Excessive Force*

Haze also claims that Kubicek used excessive force against him. Excessive force claims are analyzed under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The standard applied is one of reasonableness, *id.*, and to "[determine] whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake," *id.* at 396 (quoting *United States v. Place*, 462 U.S. 696 (1983)). This is a an inquiry that "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal citation omitted). Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and courts should include "allowance for the fact that police officers are often forced to make split-second judgments" in situations that are "rapidly evolving." *Id.* at 397.

According to Haze, he was approached and almost immediately taken to the ground. According to Kubicek, he applied a hold on Haze's arm, but Haze only fell to the ground because he threw himself there. What force was used is itself in dispute; determining if the force was reasonable is impracticable. Without a factual determination of what happened during the encounter,

-19-

I cannot determine if the force used was unreasonable under the Fourth Amendment. With such disparate accounts of what happened, summary judgment is not appropriate on the merits of Haze's excessive force claim.

I now turn to the question of qualified immunity. As noted above, according to Haze, his arm was put into a hold and he was then pushed to the ground almost immediately after Kubicek approached him. As noted above, I must determine if under Haze has alleged a constitutional violation under his account of the encounter. It is "clearly established that 'police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever.'" *Payne v. Pauley*, 337 F.3d 767, 778, 780 (7th Cir. 2003) (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)). Per Haze's account, Kubicek acted without provocation. Haze has alleged a sufficient constitutional violation, and Kubicek should have known that the force he used was unreasonable. *Id.* (finding that, according to the plaintiff's account, the officer should have known the force he used was unreasonable when the officer ran at the plaintiff, knocking into her, then forced her arms behind her back, twisted her arm, and over-tightened the handcuffs where plaintiff did not resist arrest and was alleged to have committed a minor, non-violent crime). Furthermore, the right to be free from excessive force as a Fourth Amendment protection has been recognized since 1989. *See Graham v. Connor*, 490 U.S. 386 (1989) (finding that excessive force claims under § 1983 should be analyzed under the Fourth Amendment, rather than substantive due process). Therefore, I cannot grant summary judgment on Haze's excessive force claim based on qualified immunity.

### 3. Municipal Liability

Kubicek also moves for summary judgment on the issue of municipal liability. Kubicek notes that the amended complaint sues him in both his personal and official capacities. A § 1983 suit

-20-

against a person in their official capacity "is essentially a claim against the municipality, alleging that the municipality's policy caused the constitutional deprivation." *Boyce v. Moore*, 314 F.3d 884, 891 (7th Cir. 2002) (citing *Holmes v. Sheehan*, 930 F.2d 1196, 1199 (7th Cir. 1991)). In order "to maintain a [*Monell*] claim against a municipality, one must establish the requisite culpability (a 'policy or custom' attributable to municipal policymakers) and the requisite causation (the policy or custom was the 'moving force' behind the constitutional deprivation)." *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008) (internal quotation marks and citations omitted).

A plaintiff can establish a policy or custom "by means of an express policy, a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Rice ex rel. Rice v. Correctional Medical Services*, 675 F.3d 659, 675 (7th Cir. 2012) (internal citations omitted). Here, Haze has not identified any policy or custom that resulted in the deprivation of rights he alleges in his complaint (unlawful arrest and excessive force). In his brief in support of his motion for summary judgment, Haze cites to the expert disclosure from the defendant wherein the expert, Lieutenant James Mac Gillis, indicates that Kubicek's actions were consistent with the department's policies, training, and procedures. (Docket # 45 at 9.) This argument does not support a *Monell* claim. Lieutenant Mac Gillis' opinion is that Kubicek's behavior was lawful and that his lawful behavior comported with department policy, training, and procedures. This does not meet the burden Haze faces; he must identify and establish a policy or custom that resulted in unlawful behavior. He has not done so.

In his brief in opposition to Kubicek's motion for summary judgment, Haze points to various allegations in his complaint that focus on the prosecution of the municipal citation he received in relation to the encounter. Specifically, in his complaint, he alleges that Kubicek is prohibited from

prosecuting him under false pretenses under the Fifth Amendment and that Kubicek abusively and maliciously prosecuted him for an offense he did not commit or acted with reckless disregard or deliberate indifference to his due process rights. (Docket # 30 at ¶¶ 46-47, *see also id.* at ¶¶ 48-49, 50-53.) Even interpreting the allegations in Haze's complaint as being against the City of Milwaukee as he presents them in his brief, Haze has not established a custom or policy as required to bring a *Monell* claim. A malicious prosecution claim against the City is a claim in and of itself; it does not establish an underlying policy or custom that would allow municipal liability to attach to any constitutional violations committed by Kubicek (unlawful arrest or excessive force, as alleged by Haze). Furthermore, even if I interpret Haze's allegations as being against Kubicek for maliciously prosecuting him (as they seem to read in his complaint), he has not shown that Kubicek's actions were the result of a custom or policy of the department or the City.

In short, Haze has not established culpability (a policy or custom) or causation between a policy or custom and his alleged constitutional deprivation. Therefore, Kubicek's motion for summary judgment dismissing the suit against him in his official capacity is granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (Docket # 36) is **GRANTED IN PART AND DENIED IN PART**. The plaintiff's motion for partial summary judgment is **DENIED**.

Dated at Milwaukee, Wisconsin this 26th day of August, 2015.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge

-22-